opinion of the court
Harvey J. Fried, J.
Defendant has been tried on two informations charging him with harassment in that he is alleged to have directed abusive and obscene language at the complainants, in a public place, with intent to harass, annoy or alarm them.
At the outset, it is necessary to consider the precise elements of the charge both under the statute, subdivision 2 of section 240.25 of the Penal Law and under the Constitution particularly in view of defendant’s claim that any words he may have spoken are shielded from prosecution by his First Amendment right of free speech.
The constitutional issue in this context does not appear to have been decided previously in this State. Guidance, therefore, must be found in a trilogy of United States Supreme Court decisions addressing the issue under similar statutes enacted in other States: Chaplinsky v New Hampshire (315 US 568, 569), which upheld a defendant’s conviction under a New Hampshire statute prohibiting the *741 use of “offensive, derisive or annoying” words; Cohen v California (403 US 15), which reversed a defendant’s conviction under a California law punishing the malicious and willful disturbance of the peace by offensive conduct; and Gooding v Wilson (405 US 518, 519), in which the Supreme Court struck down a Georgia statute outlawing the use of “opprobrious words or abusive language, tending to cause a breach of the peace”.
The common theme uniting the cases, despite superficially divergent results, is that the free expression of opinion cannot be abridged, however false, unpopular or even offensive the opinion may be; further, that the State lacks the power to punish the choice of words used to express those opinions, however vulgar, insulting or even painful the words may be.
The cases recognize, however, a class of utterance which is not protected by the Constitution. These utterances are referred to as “fighting words” and have been defined by the Supreme Court to mean those personally abusive words or epithets which, when addressed to a person of common intelligence and sensitivity, are inherently likely to provoke an immediate and violent reaction, i.e., a fight.
There are, of course, a great many opinions and a very great many offensive, personally distasteful words with which to express them, which may provoke a violent reaction in the listener. Yet, if those words serve to convey or dispute a viewpoint — however disreputable that viewpoint — then the Constitution’s protection is absolute. It is only where the words are uttered as a deliberate challenge to a breach of the peace, with communication of thought a mere incidental concomitant, that a prosecution may lie. The extreme example of such cases, of course, is that of the legendary western gunfighter taunting his reluctant victim into a fatal “first draw”. It is to provide an alternative to the shootout, not to inhibit the exposition of thought, that we penalize the challenge.
In the case at bar, defendant is charged, in statutory language, with directing a series of abusive and obscene statements at the complainants for the purpose of harassing, annoying or alarming them. The gravamen of the *742 offense, however, in order to pass constitutional muster cannot lie solely in the repugnancy of the words alleged or even in fact that they were intended to be offensive but rather in the fact, if it is a fact, that the offending words were calculated to provoke a reasonable person into an immediate and violent breach of the peace — and had no other purpose. This court holds that subdivision 2 of section 240.25 of the Penal Law, as so limited, is constitutional.
Having thus determined what it is that must be proven, we turn now to the facts.
It is perfectly clear that on the evening of October 25, 1981 at Finn’s Tavern in Mt. Kisco, defendant directed heated language at the complainants. It is clear, too, that the language used met the everyday meaning of “abusive” and “obscene”. Although a great deal of trial testimony focused on whether or not a particular racial epithet was used, that issue really is quite beside the point from a legal although obviously not a moral or emotional standpoint.
As was implicit in the court’s analysis of the constitutional issues involved, there are no particular words which are “per se” illegal. “Fighting words” may be polished as well as vulgar; context and intent rather than the quality of one’s vocabulary are decisive. Similarly, as the court observed during closing argument, the use of obscenities while unseemly, is not illegal. In Cohen v California (supra, p 20), the Supreme Court held: “Whatever else may be necessary to give rise to the States’ broader power to prohibit obscene expression, such expression must be, in some significant way, erotic * * * It cannot plausibly be maintained that [defendant’s] vulgar allusion * * * would conjure up such psychic stimulation in anyone”.
It is true, however, that both obscenities and racial epithets, by their very nature, are particularly susceptible to being used and viewed as “fighting words”; the extent and manner of their use here, therefore, was relevant to the issues of defendant’s intent and to the likelihood that they would challenge a reasonable man to fight. On this crucial issue, it may be noted, defendant acknowledged using obscenities — but only in answer, he said, to slurs *743 cast at him; claimed he used the term “drug pusher” only in the context of his belief that drugs were present at the tavern; and denied absolutely the use of any racial epithet.
The testimony of prosecution witnesses William Chiacchia and Jeffrey Brown flatly contradicted significant elements of defendant’s testimony and credibly cataloged samples of defendant’s abusive language in the context of a loud barroom brawl between defendant and several bar patrons including complainants Clifton Mosely and James Fergerson. Indeed, defendant’s own witnesses, while challenging some words which the prosecution attributes to defendant, also corroborate the prosecution’s position that defendant made references to his judicial powers and directed obscenities, as well as, at the very least, racial “allusions” toward the complainants.
Brown and Chiacchia, however, both were focusing or trying to focus their attention on a World Series game being shown on the bar television set and their observations of the prolonged encounter between complainants and defendant were fragmentary. Indeed, Chiacchia and other witnesses testified to a loud and very much two-sided verbal altercation while Brown’s recollection during his brief visit was of a one-sided conversation, only, with Mosely and Fergerson remaining silent. These two witnesses, therefore, were vital to set the stage for, and to corroborate the testimony of Fergerson and Mosely in the areas mentioned. Only Mosely and Fergerson, however, could fine-focus on the entire sequence of events. Only their testimony for the prosecution could illuminate the delicate factual and constitutional distinctions between words spoken with the single-minded intention of provoking a breach of the peace and insults hurtled in the context of an escalating dispute or even uttered as an offensive, albeit constitutionally protected expression of defendant’s personal opinion.
Fergerson and Mosely both paint defendant as an officious bully consciously perverting his judicial office to the interests of bigotry. But the intensity of their efforts to undo defendant resulted in such embellishments on the truth that fact and fancy have become inseparably entwined. The testimony of Fergerson was significantly *744 different from that of Mosely, and almost innocuous when compared with Mosely’s recital of events. Yet, Fergerson was the central figure in the encounter with defendant. In some areas where Fergerson and Mosely do agree, the agreement is so precise — describing the scene and their thought processes in virtually identical words — as to suggest careful scripting or rehearsal.
At points, the testimony of both not only departed significantly from their earlier statements, but was frankly incredible. The testimony, for example,. that they had voiced no complaint to the police as to defendant’s use. of the word “Nigger” because they didn’t want to hurt defendant, while at the same time they were complaining, formally, to the same police and to the District Attorney that defendant had used a multitude of other racial epithets, obscenities and threats to misuse his judicial office, defies credulity. Their claim to have sat by, docilely and silently, for an hour or more while defendant delivered a virulent racial harangue from a distance of as little as two feet is counter to human experience. However inhibited they might have been by defendant’s title and supposed power, such patience would have been superhuman.
Without going further, it should be apparent that the court regards much of the testimony on this key issue as critically tainted on both sides. The difference, however, is that in a criminal case, defendant has nothing he need prove. Defendant is presumed to be innocent. The prosecution, however, has the burden of proving every element of its case. It must prove criminality, not only impropriety, and it must prove it beyond a reasonable doubt. This, it has not done.
The verdict of the court therefore is that defendant is not guilty. The informations are dismissed. Defendant is discharged.